# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

LEI Packaging, LLC,

      Plaintiff,

v.

Emery Silfurtun Inc., Samey ehf, and
Hedinn Ltd.,

      Defendants.

**MEMORANDUM OPINION
AND ORDER**
Civil No. 15-2446 ADM/BRT

_____

Peter C. Hennigan, Esq., William Z. Pentelovitch, Esq., and Sarah A. Horstmann, Esq., Maslon LLP, Minneapolis, MN, on behalf of Plaintiff.
_____

## I. INTRODUCTION

This matter is before the undersigned United States District Judge for a ruling on the damages claim of Plaintiff LEI Packaging, LLC ("LEI"). After being granted Default Judgment [Docket No. 135] against Defendant Samey ehf ("Samey"), LEI's earlier request for damages was denied as premature. See Mem. Op. Order [Docket No. 155]. The claims against Hedinn are now resolved, and for the reasons set forth below, LEI's renewed request for damages against Samey is granted.

## II. BACKGROUND[1]

LEI seeks judgment against Samey in the amount of $4,454,873.43 for damages related

---

[1] An abridged version of the lengthy background of this case will suffice here. A complete recitation of the events in the case, including specifics of Samey's involvement in designing, constructing, and installing the Machine, is included in LEI's Memorandum on Motion for Default Judgment [Docket No. 161] and is incorporated herein by reference. Similarly, the conclusions of LEI's experts pertaining to Samey's role in the defects that have plagued the Machine since late 2014 are also incorporated by reference.

to LEI's purchase of a Rotary Quattro TO Pulp Moulding Machine (the "Machine"). This is LEI's second effort to secure a money judgment against Samey after Default Judgment was entered against Samey on November 17, 2016. In a March 22, 2017 Memorandum Opinion and Order [Docket No. 155], the Court denied as premature LEI's initial attempt to obtain a sum certain judgment because co-Defendant Hedinn Ltd. ("Hedinn") remained an active participant in the case.

On April 11, 2017, LEI agreed to dismiss all claims against Hedinn. See Stipulation [Docket No. 156]. Now, with Hedinn's case resolved, LEI renews its motion seeking judgment against Samey.

**A. Samey's History in this Lawsuit**

**1. Samey's Dismissal Motions are Denied**

Samey was named in the original lawsuit LEI filed on April 20, 2015 in Minnesota state court. See Compl. [Docket No. 1-1]. On July 17, 2015, Samey (and Hedinn) filed the first of three motions to dismiss. See Mot. Dismiss [Docket No. 18]. This Motion was made moot by the Amended Complaint [Docket No. 30] LEI filed on August 7, 2015.

LEI and Defendant Emery Silfurtun Inc. ("Emery") agreed to arbitrate their claims, but Samey and Hedinn refused to participate in arbitration. In response, LEI served upon Samey and Hedinn the Amended Complaint and Demand for Arbitration, seeking an order compelling Samey and Hedinn to participate in arbitration. Samey's (and Hedinn's) second Motion to Dismiss [Docket No. 34] followed, which prompted LEI to file a Motion to Compel Arbitration [Docket No. 41]. On December 22, 2015, both Motions were denied. See Mem. Op. Order [Docket No. 56].

Samey then sought to stay proceedings pending the resolution of the ongoing arbitration between LEI and Emery. See Letter [Docket No. 61]. That too was denied. See Letter [Docket No. 64].

On February 23, 2016, LEI filed its Second Amended Complaint [Docket No. 66], alleging that Samey designed, manufactured, and planned the installation of the electrical controls for the Machine. Second Am. Compl. ¶ 37. LEI further alleged that a Samey employee served as the "Project Manager" for the Machine, and that Samey was directly responsible for problems with the Machine's robotic transfer system. Id. ¶¶ 21, 39, 48. Based upon these and other allegations, LEI asserted third-party beneficiary claims against Samey for breaching its contract with Emery to design, manufacture, install, and maintain the Machine as required by its contract with Emery. Id. ¶¶ 58–62. LEI also asserted direct claims against Samey for breaches of the implied warranties of merchantability and for fitness for a particular purpose. Id. ¶¶ 63–73.

On March 15, 2016, Samey (and Hedinn) filed a Motion to Dismiss [Docket No. 79] the Second Amended Complaint. Samey argued that 1) the Court lacked personal jurisdiction over Samey, 2) Minnesota was an improper venue, 3) there was no basis for joint and several liability, and 4) the Second Amended Complaint failed to state plausible causes of action. On August 16, 2016, Samey's third Motion to Dismiss was denied in its entirety. See Mem. Op. Order [Docket No. 105].

**2. Samey Does Not Defend the Case**

On September 8, 2016, counsel for Samey informed LEI's counsel that Samey would not answer the Second Amended Complaint. Hennigan Decl. [Docket No. 120] ¶ 11. On September

3

9, 2016, counsel for Samey filed a Motion to Withdraw [Docket No. 113]. The motion was granted on October 11, 2016. See Order [Docket No. 132].

On September 15, 2016, LEI Applied for Entry of Default [Docket No. 119], which the Clerk of Court entered on September 26, 2016. See Entry Default [Docket No. 122].

**B. LEI's Damages Claims Against Samey**

Although there are three defendants in this case, LEI contends that Samey bears responsibility for the majority of the Machine's failures. LEI bases its contention on Samey's extensive involvement with the project overall, as well as Samey's exclusive responsibility for significant components of the Machine that failed to perform to specification.

**1. History of Emery and Samey's Relationship**

Emery has previously subcontracted with Samey to help execute its pulp molding projects. Hennigan Decl. [Docket Nos. 162–172] at Ex. 10 ("Jonsson Dep.") at 25:25–26:2; 29:15–19. Of the 55 pulp molding projects Emery has completed, Samey was involved in 15 to 20 of them. Id. 37:19–23.

In previous projects, Emery supplied its own project managers. Due to the "overwhelming complexity of electronic part" of the Machine, Emery appointed Samey to be the project manager. Id. 39:9–40:25. This was only the second time Emery had designated Samey as the project manager. Id. 40:16–19.

Emery considered the Machine to be a "repeat order" and "identical" to two machines that Emery successfully installed in 1997 in Pontivy, France. Id. 23:4–6; 24:3–9; 66:24–67:3. Samey was a subcontractor on the Pontivy project, and the specifications for the Machine were imported from the Pontivy machines. Id. 25:18–26:2; 66:15–18.

4

There were only two major differences between the Machine and the Pontivy machines. First, the Machine functioned with a motor that used electrical signals to drive the Machine's rotor. Id. 48:1–6. By contrast, the Pontivy machines were driven by a mechanical index gear. Id. Second, the Machine used a robot to transfer molded products whereas the Pontivy machines relied upon a mechanical transfer arm. Id. 48:1–9.

**2. Emery Subcontracts with Samey to Assist with the Machine Project**

On January 22, 2014, LEI agreed to pay Emery $4,509,858 to design, construct, and install the Machine. Second Am. Compl. ¶¶ 1, 7, Ex. A ("Machine Agreement"). On February 19, 2014, Emery contracted with Samey to assist with carrying out its obligations under the Machine Agreement. Hennigan Decl. Ex. 35 ("Samey Subcontract"). The Samey Subcontract specified that the contract was "for the 'LEI Packaging L. L. C.', factory in Minnesota, USA and is a Emery Quattro Type A machine, with wet press, robot transfer, six unit dryer, pulp unit, vacuum unit, five station hot press and product stackers." Id. The Samey Subcontract stated that Samey is "responsible for electrical and automation parts, including a robot function and control systems as well as providing overall project management services and testing facilities." Id. Samey was also responsible for "logistics of sourcing and ordering of several major components from 3rd party vendors." Id. The project overview and scope section of the Samey Subcontract specify that Samey was exclusively responsible for "Ordering components," "Manufacture electrical and controls," and "Electrical assemble." Id.

Samey received the Machine Agreement on February 20, 2014, the day after signing the Samey Subcontract. Id. at Ex. 9. Under the terms of the Machine Agreement, the Machine was supposed to produce a maximum output of "7200 egg trays or carton per hour," and the Machine

5

was supposed to be installed between "approximately September 15th to September 30th 2014" with a $1,500 per day penalty if installation was not completed by October 7, 2014. Id. During the initial meetings in early 2014, Samey did not raise any concerns about meeting the promised output of the Machine or the timeline for installation. Jonsson Dep. at 148:4–9.

Samey's involvement on the Machine was extensive; at least six different Samey employees worked on the Machine, including one who served as Project Manager. Id. 85:4–9. From LEI's perspective, it appeared that Samey was in charge of the project by February or March 2014. Hennigan Decl. at Ex. 36 at 47:3–5. However, starting in January 2015, a Hedinn employee took over project management responsibilities. Id. at Ex. 134. At this time, LEI realized that Samey's role had decreased significantly and Samey was now playing only a minimal role in the installation of the Machine. Johnson Decl. [Docket No. 162] ¶ 16.

### 3. Problems with the Machine

At the end of 2014, the Machine was far from fully operational. On January 1, 2015, LEI brought in Tyler Lessard ("Lessard") as a maintenance engineer to keep the Machine running and to perform preventive maintenance. Hennigan Decl. Ex. 135 ("Lessard Dep.") at 37:18–38:10. When he arrived on-site in January, Lessard found a Machine that was barely operational, later testifying that "Everything on the machine was not working." Id. 38:13–14. Among other problems, Lessard found that at the end of January 2015, the Machine was only capable of operating for one hour per day. Id. 27:1–8.

In February 2015, Phil Chenier ("Chenier"), an experienced project manager for multi-million dollar pulp molding plants who worked on more than 120 projects for Emery, was brought in to "evaluate the problems" with the Machine. Chenier Decl. [Docket No. 163] ¶¶ 2,

4. Emery decided to get Chenier involved because the "relationship with Samey was breaking down." Jonsson Dep. at 105:4–8.

LEI later engaged Chenier as an expert witness to produce testimony regarding the performance of the Machine and the work performed by Samey and Hedinn. See Chenier Decl. Ex. A ("Chenier Report"). In his "Investigative Report," Chenier outlines Samey's deficiencies as project manager and electric controls engineer. Id. According to Chenier, "Samey completely failed in its role as project manager." Chenier Decl. ¶ 13. Chenier also concluded that Samey: 1) failed to identify obvious defects with the Machine's wet press; 2) selected an undersized transfer robot; 3) programmed the robot incorrectly; 4) failed to observe that the high density cleaner was not operating correctly; 5) failed to identify and resolve issues with the servo motor; 6) failed to identify and mitigate problems with the Machine's dryer; and 7) failed to remedy problems with the Machine's hot press. Chenier Report at 7–10, 15, 28, 32–33, 36–44.

Similarly, Fridrik Jonsson ("Jonsson"), Emery's CEO, also believes that Samey is primarily responsible for the Machine's failures: "In summary, I blame Samey for having over-sold me a solution which they did not deliver. . . . [A] majority of the blame in this project goes to the electronics part, which is - - was delivered by Samey." Jonsson Dep. at 291:2–3; 15–17. Jonsson attributes the bulk of the Machine's inability to produce the promised volume of cartons on the Machine's servo motor and robot transfer, with the motor being the "most serious problem with the machine." Id. 290:5–12; 303:7–12. Jonsson further avers that Samey stopped providing support for the Machine in early 2015 even though the Machine was not functioning properly. Id. 103:24–104:9; Johnson Decl. ¶ 29.

## III. DISCUSSION

LEI alleges six different categories of damages attributable to Samey's participation in the project: 1) lost production profits damages; 2) lost prices profits damages; 3) lost profits due to delay damages; 4) damages for repairs, replacement parts, and reprogramming; 5) project management damages related to converting the Machine to produce flats; and 6) project management damages related to the Machine's dryer. In total, LEI asserts that Samey is responsible for $4,460,098.43 in damages.

### A. Lost Production Profits Damages

The Machine first started producing saleable cartons in March 2015. Johnson Decl. ¶ 20. The Machine's output of saleable cartons in spring 2015, however, never surpassed 10% of the contractually promised 2.7 million cartons per month during the first year of production. Id. A July 2015 video shows that in early 2015, the Machine still produced defective cartons, continued to experience hot press malfunctions and printer jams, and required four employees to monitor the Machine's dry-end.

This led to LEI's decision to convert the Machine to produce 5x6 "flats," which would reduce the need for the wet press and replace the hot press with a simpler stacker machine. Id. ¶ 30. The conversion also required additional modifications, including new dies and platens for the rotor and robot, and new electrical controls and programming changes. Id. With this change the Machine produces close to 3,000,000 flats per month, which is 60-65% of the expected output. Id. Because the changes permanently altered the mechanical loads on the Machine's rotor, the Machine is not capable of achieving higher rates of production. Chenier Decl. ¶ 14.

LEI calculates its lost production profits damages based on the difference between the

number of units that LEI was promised the Machine could produce (51.6 to 57.3 million annually) and the number of the units the Machine actually produces (33 million in 2016) and can expect to produce in the future (34.2 million annually). Johnson Decl. ¶ 31. LEI has calculated its lost profit damages for the years 2015 through 2021. Id.

If the Machine was capable of producing the 51.6 to 57.3 million flats annually as promised, it would be able to sell all its product. Id. ¶ 32; see also Hennigan Decl. Ex. 140 [Docket No. 172] ("Cobb Report") at 30 (discussing LEI's supply agreements show that LEI was capable of selling more cartons if they could be produced). Additionally, the market demand for eggs increases 1.0 to 2.0 percent per year, largely the result of population growth. Johnson Decl. ¶ 32.

The total amount of lost production profits damages for the years 2015 to 2021 is $5,050,848. Cobb Report at 31–32. This accounts for incremental expenses such as advertising, travel, and wages. Id. After applying a 5% discount rate to rebate the future economic benefits to present value, the amount is reduced to $4,545,656.

LEI contends that Samey is 70% responsible for the lost production profits damages. LEI's contention is based upon Samey's demonstrated failures as project manager, its abandonment of the project before the Machine became operational, and its failure to properly provide a functional robot system and electrical controls. The Court agrees that the evidence reflects Samey is largely responsible for the Machine's failures, and further agrees that allocating 70% of the total lost production profits damages to Samey is appropriate. Therefore, Samey is responsible for $3,181,959.20 in lost production profits damages.

## B. Lost Prices Profits Damages

When the Machine was converted to 5x6 flats in early 2015, LEI lost the ability to produce egg cartons. Johnson Decl. ¶ 35. Egg cartons sell for a higher price than flats, so LEI lost profit on every flat it sells in place of egg cartons. The average price for an egg carton is $0.0828, which is 3.5% greater than the average price of a 5x6 flat, which is $0.0800. Id. Similarly, the average price of cartons and flats is $0.0814, which is approximately $0.0014 greater than the average price of flats.[2] LEI's lost profits damages represents the difference in value between what LEI could have made selling cartons and flats compared to what it currently makes selling only flats.

LEI estimates that it will sell 214,170,992 flats from 2015 to 2021. Id. ¶ 36. The inability to sell both cartons and flats will cost LEI $0.0014 on each unit sold. Id. Multiplying the cost lost by the number of sales yields $299,839 in lost prices profits damages. Reducing that amount by 5%, the present value of lost prices profits damages, yields $267,676.

As with lost production profits damages, LEI contends that Samey is 70% responsible for its lost prices profits damages. The Court agrees. Accordingly, Samey's share for this category of damages is $187,373.20.

## C. Lost Profits Due to Delay Damages

The Machine Agreement provided that the Machine was to be installed between "approximately September 15th to September 30th 2014" and late payments would begin if

---

[2] LEI asserts in its Memorandum [Docket No. 161] that the average price of cartons and flats is $0.0819. However, if the "average price of cartons and flats" is calculated by taking the average between $0.0828 (cartons) and $0.0800 (flats), the average price would be $0.0814. If LEI still contends that the $0.0819 average is correct, it must educate the Court on how that number is calculated.

installation was not completed by October 7, 2014.  Id. ¶¶ 5, 40.

The Machine did not start producing saleable cartons until spring 2015.  Id. ¶ 41.  During this period, LEI could have produced 8,111,778 cartons.  Id. ¶ 43.  Multiplying 8,111,778 by the profit per unit amount of $0.041, and then subtracting $45,709 in incremental expenses, results in lost profits of $286,873.  Id.; Cobb Report 30–32.  The Court agrees with LEI that Allocating 70% responsibility Samey is appropriate.  Accordingly, Samey's share on the lost profits due to delay damages in $200,811.

### D.  Damages for Repairs, Replacement Parts, and Reprogramming

LEI also seeks damages for repairs, replacement parts, and reprogramming directly attributable to Samey.  These costs include repairs to the Machine's robot and servo motor, and payments to vendors who had to reprogram the software on the robot and perform electrical work on parts Samey installed.  Johnson Decl. ¶¶ 47, 48; see also Hennigan Decl. Exs. 151–71 (listing expenses for repairs, replacement parts, and reprogramming).  Samey is therefore responsible for the entirety of damages for repairs, replacement parts, and reprogramming, which total $51,920.07.

### E.  Project Management Damages Related to Converting the Machine to Produce Flats

Converting the Machine to produce only flats required extensive alterations to the original Machine.  Johnson Decl. ¶ 49.  The platens for the rotor and robot had to be redesigned, and new dies were manufactured.  Id.  The hot press was replaced with a stacker, and LEI had to purchase a separate machine to wrap the finished flats.  Id.  The costs to convert the Machine to produce flats total $471,831.  Hennigan Decl. Exs. 172–80.

As with other categories of damages, 70% of the damages related to converting the

11

Machine to produce flats are attributable to Samey.  Had Samey provided proper project management and not abandoned the project prior to the Machine being fully functional, some of these problems could have been avoided or properly remedied.  In abandoning the project, LEI was forced to find solutions on its own, including making the decision to convert the Machine to produce only flats.  Accordingly, Samey is responsible for $292,482.26 in project management damages related to converting the Machine to produce flats.

**F.  Project Management Damages Related to the Machine's Dryer**

The Machine's dryer system suffered from many defects that required extensive repair.  For example, the exhaust system was unable to remove evaporated water and had to be replaced with a larger dryer that included exhaust fans.  Johnson Decl. ¶ 51.  The inadequacy of the initial dryer system resulted in moisture damage to insulation panels, which then needed to be replaced.  Id. ¶ 52.  Leaking supply ducts needed to be repaired and replaced, and the building's insulation and cedar shakes were also damaged by excessive moisture from the dryer system.  Id. ¶ 53, 54.  In sum, the dryer related damages total $683,767.

Had Samey performed proper project management and not abandoned the project prematurely, the problems likely would have been identified and resolved before they caused further damage.  Samey is therefore 70% responsible for the project management damages related to the Machine's dryer.  Accordingly, Samey's share for these damages is $478,636.90.

**G.  Conclusion of Damages**

Samey is largely responsible for the Machine's failures.  This includes the Machine's initial inability to produce the volume of egg cartons LEI was promised, which forced LEI to abandon production of cartons and switch exclusively to flats.  Samey is also largely responsible

for the repairs and replacement of Machine components, including the dryer, press, and motor.

LEI agreed to pay over $4.5 million for a machine with specific capabilities. The Machine LEI received was a shadow of the promised and bargained for product. Although multiple parties were involved in the Machine's design, construction, and installation, Samey bears the lion's share of the fault. Accordingly, Samey is responsible for the sum total of the $4,393,182.63 damages described above.

## IV.  CONCLUSION

Based on the foregoing, and all the files, records and proceedings herein, **IT IS HEREBY ORDERED** that: Plaintiff LEI Packaging, L.L.C. is entitled to Judgment against Defendant Samey ehf in the amount of $4,393,182.63.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

BY THE COURT:


s/Ann D. Montgomery
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated: August 16, 2017.